```
1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
2   _____

3   United States of America,    ) Criminal
                                  ) No. 1:21-mj-00511-RMM-1
4                    Plaintiff,   )
                                  ) Initial Appearance/
5   vs.                           ) Detention Hearing
                                  )
6   Fi Duong,                     ) Washington, D.C.
                                  ) July 2, 2021
7                    Defendant.   ) Time:  2:26 p.m.
    _____

8
          Transcript of Initial Appearance/Detention Hearing
9                         Held Before
        The Honorable Magistrate Judge G. Michael Harvey
10               United States Magistrate Judge

11  _____

                    A P P E A R A N C E S
12
    For the Plaintiff:       Jacob Steiner
13                           Stuart D. Allen
                             U.S. ATTORNEY'S OFFICE FOR THE
14                           DISTRICT OF COLUMBIA
                             555 Fourth Street, Northwest
15                           Washington, D.C. 20530

16  For the Defendant:       Sabrina P. Shroff
                             OFFICE OF THE FEDERAL PUBLIC DEFENDER
17                           625 Indiana Avenue, Northwest
                             Suite 550
18                           Washington, D.C. 20004

19  Also Present:            Christine Schuck, Pretrial Services
                             Officer
20
    Proceedings reported by FTR Gold Electronic Recording Software.
21  _____

22  Transcribing Stenographic Court Reporter:
                             Nancy J. Meyer
23                           Registered Diplomate Reporter
                             Certified Realtime Reporter
24                           333 Constitution Avenue, Northwest
                             Washington, D.C. 20001
25                           202-354-3118
```

1            <u>P R O C E E D I N G S</u>

2            THE COURTROOM DEPUTY:  This is Case 21-mj-511,

3   United States of America v. Fi Duong.  This is scheduled to be

4   an initial -- initial appearance held by video.

5            Will the parties please introduce themselves to the

6   Court, beginning with the government.

7            MR. STEINER:  Good afternoon, Your Honor.  Jacob

8   Steiner for the United States.  I'm standing in for Stuart

9   Allen this afternoon, who is also present on the Zoom.

10            MR. ALLEN:  Good afternoon, Your Honor.

11            MS. SHROFF:  Good afternoon, Your Honor.  For

12   Mr. Duong, Sabrina Shroff from the Office of the Federal Public

13   Defender.

14            THE PRETRIAL SERVICES OFFICER:  I am Christine Schuck

15   with pretrial services.

16            THE COURT:  Well, one thing before we start, I -- I

17   don't have the pretrial services report.  My -- if it's out

18   there, if my clerk could please send it to me.

19            THE LAW CLERK:  I'm not -- I have not received it

20   yet, Judge.

21            THE COURT:  Ms. Schuck, where is the pretrial

22   services report?

23            THE PRETRIAL SERVICES OFFICER:  It was uploaded over

24   an hour ago, but I will send it to your chambers now.

25            THE COURT:  Ms. Tran, please go ahead and swear in

 1    the defendant.

 2              THE COURTROOM DEPUTY:  Mr. Fi Duong.

 3              (Oath administered.)

 4              THE DEFENDANT:  Yes.

 5              THE COURT:  Sir, please state your name for the

 6    record.

 7              THE DEFENDANT:  My name is Fi Duong.

 8              THE COURT:  How old are you?

 9              THE DEFENDANT:  Twenty-seven years old.

10              THE COURT:  How far did you get in school?

11              THE DEFENDANT:  High school graduate.

12              THE COURT:  Have you taken any drugs, alcohol, or

13    medicine in the past 24 hours that would make it difficult for

14    you to understand what's happening here today?

15              THE DEFENDANT:  No, sir.

16              THE COURT:  Sir, you're here for purposes of an

17    initial appearance on a criminal complaint.  I'm going to tell

18    you the charges that you presently face, the consequences if

19    you're found guilty of those charges, and make sure you

20    understand your rights.  And I'll appoint you an attorney, if

21    you're eligible.  Then we're going to have a discussion about

22    whether or not you're going to be released here today and, if

23    so, on what conditions.

24         Sir, you're here because, as you know, you were

25    arrested -- you were arrested as a result of a criminal

1    complaint which charges you, I believe, with five counts, which

2    I'm going to review for you briefly now.

3         Give me one moment.

4         Okay.  I have it here now, the information.  You were

5    charged, first, with one count of entering or remaining in a

6    restricted building in violation of 18 U.S.C. § 1752(a)(1).  If

7    you're found guilty of that charge, you could face up to a year

8    in jail, a fine of 250 -- of $100,000, or both, and the Court

9    could impose up to one year of supervised release, in addition

10   to any period of incarceration.

11        You're also charged with disorderly and disruptive

12   conduct in a restricted building in violation of 18 U.S.C.

13   § 1752(a)(2); that charge carries up to a year in jail, a fine

14   of $100,000, or both, and up to one year of supervised release.

15        Third count, or charge, is to violent -- violent entry

16   and disorderly conduct in the Capitol grounds in violation of

17   40 U.S.C. § 5104(e)(2)(D).  That charge carries up to six

18   months in jail, a fine of $5,000, or both.

19        You're also charged with parading, demonstrating, or

20   picketing on the Capitol grounds in violation of 40 U.S.C.

21   § 5104(e)(2)(G).  That charge carries up to six months in jail,

22   a fine of $5,000, or both.

23        Finally, you're charged with obstruction of an official

24   proceeding in violation of 18 U.S.C. § 1512(c)(2).  That charge

25   carries up to 20 years in jail, a fine of $250,000, or both,

1    and the Court could impose up to three years of supervised

2    release.

3         So those are four misdemeanors, and the last one is a

4    felony.

5         Sir, you have certain rights at this point.  You have

6    the right to remain silent.  Anything you say can be used

7    against you.  Do you understand that right?

8              THE DEFENDANT:  Yes, sir.

9              THE COURT:  You also have the right to an attorney.

10   If you can't afford to hire your own attorney, the Court will

11   appoint an attorney to represent you free of charge, if you're

12   eligible.  Do you understand that right?

13             THE DEFENDANT:  Yes, sir.

14             THE COURT:  I should have said at the beginning --

15   and I failed to -- that -- that this matter is being handled

16   by -- remotely and by video and audio here today because of the

17   pandemic and pursuant to the Chief Judge's standing order.  We

18   do it to both protect your health and safety and also the

19   health and safety of the other court participants.  But I can

20   only proceed by video and audio here today with your

21   permission, sir.  So do you consent to me conducting this

22   initial proceeding by audio and video?  Do you waive your right

23   to any in-person proceeding here today?

24        Yes or no?

25             THE DEFENDANT:  No.

```
 1              THE COURT:  I'm sorry.  No, you don't waive your
 2     right to an in-person proceeding?
 3              THE DEFENDANT:  As in I would be able to meet in
 4     person at some point.
 5              THE COURT:  Sure.
 6              MS. SHROFF:  Your Honor -- I'm sorry.
 7              THE COURT:  I'm happy to reschedule this.  We can do
 8     it next week sometime --
 9              MS. SHROFF:  Your Honor --
10              THE COURT:  -- but you're not going to be released
11     here today.  Yes, sir -- yes, ma'am.
12              MS. SHROFF:  Thank you, Your Honor.
13         Your Honor, may -- if -- if Mr. Duong persists, may I
14     just have two minutes with him in the breakout room?
15              THE COURT:  Sure.  I mean, I want to make sure he
16     understands what his options are.  We can go forward here today
17     or I can make arrangements for an in-person proceeding next
18     week.
19              THE DEFENDANT:  I'm -- I'm trying to understand the
20     options, sir.
21              THE COURT:  Sure.  I'm trying to tell you what they
22     are.  We can go forward --
23              THE DEFENDANT:  Okay.
24              THE COURT:  -- with this proceeding here today
25     remotely.  If you don't consent, then that's fine.  It's your
```

```
1   right not to consent.  I will schedule an initial proceeding

2   for next week, and we can do this next week.  All right?  We

3   can do it --

4               (Indiscernible simultaneous cross-talk.)

5               THE DEFENDANT:  I'll do it right now, sir.

6               THE COURT:  All right.  Then we'll do it right now.

7               THE DEFENDANT:  We can do it now.

8               THE COURT:  Okay.  So I have your consent to proceed

9   by -- remotely here today; is that correct?

10              THE DEFENDANT:  Yes, sir.

11              THE COURT:  I understand that you're not waiving your

12  right to do all future proceedings in person, and, indeed, the

13  court is slowly -- and actually more quickly opening up with

14  respect to proceedings.  In the coming months there will be, I

15  think, far more in-person proceedings.  This covers what we're

16  doing here today.  We're only, I think, at the very tail end of

17  this pandemic.  So I think your future proceedings are more

18  likely to be in person, but you'll have the option for each of

19  those proceedings to decide what you want to do.

20              It may be easier for you to have a proceeding from your

21  home in Virginia than come into -- to court for whatever the

22  proceeding may be.  But, again, we just have to cover what your

23  position is for purposes of this hearing today, and we've done

24  that.

25              Let's go ahead and talk about counsel.  Mr. Duong, do
```

1    you want the Court to appoint an attorney to represent you, or

2    would you like to hire an attorney with your own money?

3             THE DEFENDANT:  I would take a court-appointed

4    attorney.

5             THE COURT:  Okay.  Ms. Shroff, I haven't received a

6    financial affidavit for this defendant.  That's fine.  But then

7    I'm going to go ahead and ask him on the public docket the

8    standard questions to determine his eligibility.  Is there any

9    objection to that?

10            MS. SHROFF:  Your Honor, may -- may I have the

11   Court's permission to simply submit a financial affidavit by

12   end of the day Tuesday in lieu of a public inquiry?

13            THE COURT:  Okay.  Well, again, I'll let you do that

14   now, but in the future, either I have the financial affidavit

15   or we're going to go forward; all right?  So --

16            MS. SHROFF:  Yes, Your Honor.

17            THE COURT:  -- part of the obligation -- part of your

18   obligation is to provide that financial affidavit, and you can

19   do it right now.  You could ask for ten minutes before the

20   hearing to have a breakout room, fill out the financial

21   affidavit, and submit it to the Court.

22            Mr. Tran can send it to you if you don't have it.  You

23   can send it right back to him, but, you know, I don't want to

24   have multiple proceedings -- (inaudible) right now.  I don't

25   know what we're going to do.  How are we going to proceed if we

1    do not have a financial affidavit and -- you want to wait until

2    Tuesday?  Do you want me to recall this case on Tuesday?

3              MS. SHROFF:  I don't, Your Honor.  I was simply going

4    to meet with my client and --

5              THE COURT:  I'll give you the chance.  I'll let you

6    do it right now.  Why don't we do that.

7              Mr. Tran, go ahead and have a breakout session so that

8    she can -- so we can get this proceeding done here today.  Let

9    me know when it's done.

10             THE COURTROOM DEPUTY:  Yes, Judge.

11             (Off the record.)

12             THE COURT:  Let's go back on the record.

13             THE COURTROOM DEPUTY:  Yes, Judge.

14             THE COURT:  All right.  I have reviewed the financial

15   affidavit.  I did have one question about it, Ms. Shroff.  I

16   think maybe something is in -- is in its incorrect column, or

17   maybe not.  You tell me.  Under bills and debts, where it says

18   loans, does that number, the $147,000 number, reflect a monthly

19   expense or an overall debt?

20             THE COURTROOM DEPUTY:  You're on mute.

21             MS. SHROFF:  It -- it reflects the amount of money he

22   still owes the bank in --

23             THE COURT:  That's fine.  It's in the monthly

24   expense.  I can't imagine he's paying $147,000 a month.

25             MS. SHROFF:  I -- I apologize, Your Honor.  It should

1    be in the next column.

2              THE COURT:  Yeah.  And I think the next number down

3    belongs there too.  Other, 17,000, I'm thinking it goes in the

4    other column.

5              In any event, I do find based on this financial

6    affidavit the defendant is eligible for the appointment of

7    counsel.  I will appoint the federal public defender to

8    represent him in this case, specifically Ms. Shroff.

9              Sir, do you agree to Ms. Shroff being your attorney in

10   this case?

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  You will also have the right to a

13   preliminary hearing if the case is not indicted or information

14   is not filed in a timely manner.  It's at the preliminary

15   hearing where you'll have the opportunity to -- the government

16   will have the obligation to show there's probable cause to

17   believe that the crimes that you've been charged with occurred

18   and that you committed those crimes.  We'll set the date for

19   your preliminary hearing here in a moment.

20             Government, I'll hear from you with respect to your

21   request with respect to release conditions.

22             MR. STEINER:  Your Honor, the government is

23   requesting the following release conditions:  First, the

24   defendant be subject to home incarceration, meaning 24-hour

25   lockdown, except for activities as approved by the Court; the

1    defendant be subject to GPS monitoring; the defendant stays

2    away from the District of Columbia, unless for court

3    appearances, pretrial services appointments, or attorney

4    consultations; that the defendant report to pretrial services

5    in his home jurisdiction as directed; and that he verify his

6    address if he's not already done so; that the defendant not

7    travel outside of his home federal court jurisdiction without

8    first obtaining court approval; that the defendant participate

9    in all future proceedings as directed.

10           That the defendant not possess any firearms, destructive

11   devices, or other dangerous weapons, either in his home or on

12   his personal possession; that the defendant not commit any

13   local, state, or federal crimes; and the defendant surrender

14   his passport and not obtain another passport or other

15   international travel document during the pendency of this case;

16   and that the defendant not have any contact with any victims,

17   witnesses, or other defendants who have been charged in

18   connection with the events at the United States Capitol on

19   January 6th, 2021.

20               THE COURT:  Counsel, let me --

21               THE DEFENDANT:  The -- is that addressed to me?

22               THE COURT:  Hold on.  No, not yet.  Not yet.  Your --

23   your attorney is going to talk for you now, but not -- not yet.

24           I want to hear from pretrial.  Ms. Schuck, anything in

25   addition?

1    THE PRETRIAL SERVICES OFFICER:  Yes, Your Honor.  If

2  Your Honor is to impose the conditions requested by the

3  government, in this particular case, due to a long-standing

4  agreement between the Pretrial Services Agency for the District

5  of Columbia and the Eastern District of Virginia, pretrial

6  services for the District of Columbia will maintain supervision

7  of this particular case.  So he would be placed into the High

8  Intensity Supervision Program with all the conditions that go

9  along with that program, to include drug testing and whatnot.

10    THE COURT:  Okay.  Do you have any objection to that,

11  Government?  I imagine not.

12    MR. STEINER:  Your Honor, I just want to clarify.

13  The High Intensity Supervision Program is a home detention

14  versus a home incarceration program?  I'm just not -- I'm not

15  familiar enough with the exact parameters.

16    THE COURT:  Well, they have different levels, but

17  you're requesting home incarceration?

18    MR. STEINER:  Yes.

19    THE COURT:  That is one of the levels.

20    MR. STEINER:  I understood that, yeah.  Your Honor,

21  then the government would find the High Intensity Supervision

22  Program to be an acceptable alternative to the conditions that

23  I just listed.

24    THE COURT:  Ms. Schuck, though, it's that note at the

25  end that bothers me because -- has he been verified?

 1            THE PRETRIAL SERVICES OFFICER:  We -- during this

 2     hearing at 2:35 p.m., I was finally able to speak to the

 3     homeowner of the residence --

 4            THE COURT:  So his residence --

 5            THE PRETRIAL SERVICES OFFICER:  -- at the time --

 6            THE COURT:  -- has been verified and he's eligible

 7     for the High Intensity Supervision Program; is that correct?

 8            THE PRETRIAL SERVICES OFFICER:  Yes.

 9            THE COURT:  All right.  I would add to these lists --

10     I didn't hear if the government said it, but I do think this is

11     a case where any contacts with law enforcement should be

12     reported -- contacts including stops, arrests, questioning

13     should be reported to pretrial.  I think that is in your list

14     as well, Ms. Schuck; is that correct?

15            THE PRETRIAL SERVICES OFFICER:  Yes, Your Honor.

16            THE COURT:  Okay.  Ms. Shroff, I'll hear from you.

17            MS. SHROFF:  Thank you, Your Honor.

18         Your Honor, I would object to my client being on

19     lockdown or on home confinement.  I have no objection to the

20     GPS monitoring, but I would ask that the Court fashion

21     conditions that would allow him to continue working so that he

22     can have a job, be employed, and support his family.

23         I would note, Your Honor, that the -- obviously my

24     client is not a flight risk because he has stayed well past --

25     many months from January until July at the same residence.  He

1    lives with his wife, father, mother, and a 2-year-old son.  And

2    as to his -- the -- the Court can certainly fashion him being

3    able to work while he's out on bail.  That is my only

4    application.

5              THE COURT:  Where does he work?  What does he do?

6              MS. SHROFF:  He's a superintendent at a building in

7    Alexandria, Virginia.  He works as a super.  He advises me that

8    he works about 40 hours normally and occasionally has overtime

9    work on the weekend.

10             I -- I would hope that he would be able to maintain that

11   stable employment so that he can continue to support his wife,

12   who's a stay-at-home mother, and his 2-year-old son.

13             THE COURT:  What about -- you said he lives with his

14   father, maybe his mother as well; is that correct?

15             MS. SHROFF:  That's correct, Your Honor.  They all

16   live in the same household, as I understand it.

17             THE COURT:  Do you know if they work?

18             MS. SHROFF:  I do not know.  I do not believe that --

19   that they are capable of supporting him, his wife, and his

20   2-year-old son.

21             And I just point out for the Court, Your Honor, that

22   he's been employed all this time since January until July, and

23   I could go through the complaint, if the Court wants me to.

24   The majority of the complaint seems to be subject at least to

25   some argument that there seems to be a whole host of

1    entrapment-related issues that might be (inaudible) to his

2    benefit down the road.

3              THE COURT:  I have read the whole complaint.  That

4    was why I was delayed coming to the bench.  It's a long one.

5              MS. SHROFF:  It is.

6              THE COURT:  So no need to go through it.  I mean, I

7    appreciate some of your concerns that you may have.  I mean,

8    that might be the subject of a later motion, but in any event,

9    it says what it says.

10             Let me hear from the government with that request.  What

11   Ms. Shroff is requesting is not home incarceration but a --

12   still high intensity supervision, GPS monitoring, but one that

13   would permit him to leave the home for purposes of his work.

14             MR. STEINER:  Your Honor, the government would

15   maintain our request for home incarceration.  There are a few

16   things I just want to highlight.  I understand Your Honor has

17   read the complaint in-depth so I don't want to go through it,

18   but there are a few things that I think distinguish this

19   defendant from the vast majority of defendants who have come

20   before Your Honor related to January 6th.

21             And really the -- the most important thing in my mind is

22   the fact that a large amount of the conduct alleged in the

23   complaint the -- the defendant participated in, including

24   comments about wanting to overthrow the United States

25   Government, to commit acts of violence against members of the

1    United States Government, as well as members of other groups

2    exercising their First Amendment and other political rights, as

3    well as organizing, are things that the defendant did after

4    January 6th.  The defendant has not been, based on the

5    government's investigation, living a life of a law-abiding

6    citizen in the last six months.

7        The defendant has been organizing.  He has been working

8    with other members, self-described militia, to surveil the

9    United States Capitol, including when the United States Capitol

10   was surrounded by fencing and guarded by the National Guard

11   because of the events of January 6th.  The defendant has been

12   in contact with law enforcement sources.  The defendant has

13   spoken about the need to act in cloak and dagger, to be

14   secretive.  He's used encrypted messaging.  He's met with

15   organized members of a group.

16       And I -- I think, most importantly, the defendant has --

17   has stockpiled an arsenal in his home.  As detailed in the

18   complaint, he stockpiled approximately 50 bottles, glass

19   bottles, that he intended to use as Molotov cocktails.

20   Defendant recognized that continuing to purchase materials to

21   make Molotov cocktails might attract additional law enforcement

22   attention.  And so he purposefully hid his actions at -- in --

23   in order to stay under the radar.

24       There's one more thing I want to add that's not in the

25   complaint but, I think, does shed some light here on the

1    potential dangerousness of the defendant to the community; is

2    that when the defendant was arrested, there was -- was a -- a

3    miniature arsenal seized at his home that included seven

4    rifles, six pistols, and one shotgun in his residence.

5        And I think in particular, the way that those weapons

6    were stored shed some light on -- on him and it demonstrates

7    his dangerousness.  For example, he had an AK-47-style rifle

8    that was located in the backseat of a car next to a child's car

9    seat.  He had a pistol that was stored in a child's bedroom.

10   And he had another rifle that was leaned up on the wall next to

11   a bed.  Now, this was an adult's bedroom, but the rifle was

12   leaned up next to a shelf with Barbie and other children's

13   toys.

14       Your Honor, the defendant's statements, the defendant's

15   intention and desire to use violence, and the defendant's

16   stockpiling of weapons, and the way he has handled those

17   weapons demonstrates his danger to the community and his -- and

18   a neces- -- a necessity of home incarceration in this case.

19       Thank you.

20       THE COURT:  Did you see all those weapons?

21       MR. STEINER:  Your Honor, I will defer to Mr. Allen.

22   I think he may have a better understanding of -- of what has

23   happened with those weapons.

24       MR. ALLEN:  Yes, Your Honor.  I believe several of

25   them were seized by the FBI and others were seized by

1    Fairfax County, and then I believe the AK-47-style firearm that

2    was in the backseat of the vehicle was also seized by the FBI.

3            THE COURT:  Okay.  Well, you say you think most of

4    them were.  I didn't quite hear you, Mr. Allen.  I mean, one of

5    the conditions of release will certainly be that this defendant

6    not possess any firearms, to include any firearms being located

7    in his home.  I -- I don't care who officially owns them.  He

8    can't have any firearms in his home.

9            So the first question I have is for the government.  Did

10   they pull all firearms out of that house that were discovered

11   as part of its investigation, seized them as part of -- or did

12   they leave some of them behind so that I've got to now inquire

13   about those firearms and make sure they are out of the home?

14           MR. ALLEN:  Your Honor, given that the search

15   warrants were -- was executed this morning, is my

16   understanding, I cannot give the Court full confidence that all

17   the weapons were seized.  I believe that they were, but I -- I

18   cannot aver beyond that.

19           THE COURT:  You don't have an agent you could call

20   right now?

21           MR. ALLEN:  I can, Your Honor.  I can -- I can --

22           THE COURT:  I'll let you do that.  Ms. Shroff -- why

23   don't you mute and try to figure out the answer to that

24   question, Mr. Allen.

25           Ms. Shroff, I know we've got to circle back around to

1      the concern that you raised, but let's just focus on the one

2      I've just raised first, which is the location -- or the -- the

3      removal of any firearms from the house.  I was concerned about

4      that when I read the complaint.  I'm even more concerned now

5      given Mr. Steiner's representation about what was found in the

6      home.

7             I'm also concerned about this defendant's statements

8      with respect to the Second Amendment, just -- Second Amendment

9      is fine.  Lawful ownership of guns is fine.  But some concern

10     that he's not going to be particularly happy about having his

11     guns removed.  Nevertheless, that will be a condition of his

12     release in this case given the government's charges.

13            So what can you tell me about whether or not there are

14     any additional firearms in this home and whether or not the

15     defendant is going to remove them from his house as a condition

16     of release in this case?

17            MS. SHROFF:  Thank you, Your Honor.

18            Your Honor -- Your Honor, I do not have an answer as to

19     whether or not the guns will be removed from his home.  As far

20     as I know from having spoken to various people involved, that

21     the government -- that Mr. Duong was arrested as he was exiting

22     his home, I believe to go to work.  And he does not know what

23     happened as a result of the execution of the search warrant.

24            I am able to tell the Court, though, that there was no

25     arsenal in this home.  There is no stockpiling of guns.  Each

1    one of these guns is lawfully owned in the state of Virginia,

2    and if you look at the complaint, it makes clear that Mr. Duong

3    lawfully and properly (inaudible) in terms of registering the

4    guns.  And I'm sure that Mr. Duong would follow all conditions

5    set by this Court, and if one of the conditions was that he

6    surrender all of his weapons, he would do so, and pretrial

7    could make sure that that is done.

8                THE COURT:  All right.

9                (Indiscernible simultaneous cross-talk.)

10               MS. SHROFF:  -- possess the question you asked --

11               THE COURT:  That is the question.  That is the

12   question, though.  We'll see if Mr. Stuart can-- Mr. Allen

13   can -- add any more about what happened during that search.

14          Mr. Allen.

15               MR. ALLEN:  Yes, Your Honor.  Law enforcement seized

16   every firearm that they located.

17               THE COURT:  Okay.  Well, that's a start.  So chances

18   are, Ms. Shroff, there are no more firearms in that house.

19   Nevertheless, I will certainly have as a condition of his

20   release in this case that he -- all firearms, including other

21   destructive devices, are removed.  So if there are any more

22   that happen to be there, even lawfully owned, he will need

23   to -- to provide that to -- send them to a third party for

24   custody during the pendency of this case.  I want to make sure

25   that you understand that.

1    MS. SHROFF:  I will make sure Mr. Duong complies with

2    the Court's order.

3         THE COURT:  Mr. -- and I'm still going to circle back

4    to your issue.  Not quite there yet, Ms. Shroff.

5         So, Mr. Steiner, there are these allegations in the

6    complaint about Molotov cocktails.  You know, as I read the

7    complaint, they were never -- I don't think were ever fully

8    constituted.  Some thought was being given to doing so.  So I

9    don't know how far along, ultimately, those devices were at the

10   time of the search.

11        But I don't -- Mr. Steiner, Mr. Allen, can you help me

12   understand what was found in this search with respect to those

13   devices, and were they also seized as part of the government's

14   investigation?  I imagine they were.

15        MR. ALLEN:  Your Honor, whether they were seized, I

16   will double-check on that and -- and take a moment to do that

17   with Your Honor's permission.  As to whether they were fully

18   constituted, no, they were not fully constituted, to my

19   information.  No.

20        THE COURT:  All right.  Well, I'll let you check and

21   see.  I would assume that at the very least it would be

22   evidence, but I -- I do want to know.  Did they -- I know there

23   was some bottles -- a lot of bottles, apparently.  Some rags.

24        MR. ALLEN:  Yes, (inaudible) bottles.  Yes.

25        THE COURT:  Yeah.

1          MR. ALLEN:  I --

2          THE COURT:  If you could check on that, please.

3          All right.  While he's doing that, let's go back to the

4     issue that Ms. Shroff raised, which is what sort of high

5     intensity supervision he's going to be in or released on.  Is

6     it going to be home incarceration or the version that would

7     permit him to leave for work?

8          Ms. Schuck, help me understand -- and Mr. Steiner

9     understand -- what the options are.  I thought there was one

10    option that would permit -- would -- would effectively say

11    21 days of home incarceration and then maybe move beyond that

12    at pretrial's discretion, something like that.  Why don't you

13    tell me what the high intensity supervision options are.

14          THE PRETRIAL SERVICES OFFICER:  Good afternoon,

15    Your Honor.  Christine Schuck, pretrial services.

16          What you are referring to in regards to the first

17    21 days of home confinement, that is for the

18    D.C. Superior Court version of HISP.  Here at the United States

19    District Court, we utilize curfew, home detention, or home

20    incarceration.  Home detention would allow the defendant to

21    leave his residence for employment, education, religious

22    services, medical, substance abuse, mental health treatment,

23    attorney visits, court appearances, court-ordered obligations,

24    or other activities approved in advance by the pretrial

25    services officer.

1      Home incarceration, on the other hand, as Mr. Steiner

2  articulated to the Court, you are restricted to your residence

3  24 hours a day except for medical necessity, court appearances,

4  or other activities specifically approved by the Court.

5      THE COURT:  Okay.  Ms. Shroff, I wanted you to hear

6  that too.  I don't know how familiar you are with all the HISP

7  options yet, but I'll hear from you now.  You've heard from --

8      MS. SHROFF:  Thank you, Your Honor.

9      THE COURT:  Well, let me ask:  What's pretrial's

10  recommendation, Ms. Schuck?

11      THE PRETRIAL SERVICES OFFICER:  Pretrial services

12  would -- if the Court is going to impose the GPS condition,

13  pretrial services would recommend the home incarceration

14  condition.  And if Your Honor is inclined to allow the

15  defendant to work, then we can articulate on the release order

16  that he will be allowed out for employment purposes only, as

17  long as it is -- it is better -- verified in advance.

18      We also are requesting that he report to us via

19  telephone on Tuesday, the 6th, for a telephone interview since

20  we were not able to interview him prior to today's hearing.

21      THE COURT:  Okay.  So, Ms. Shroff, Ms. Schuck has

22  just suggested another option in between the -- the two major

23  ones of home incarceration and home detention.  It would be

24  simply home incarceration but would permit him to leave only

25  for purposes of employment and only if there was some, you

1  know, schedule worked out with pretrial as to when he -- when

2  he would be away for work, and, of course, he would be GPS

3  monitored when he left the house.

4        Ms. Shroff.

5        MS. SHROFF:  Thank you, Your Honor.

6        Your Honor, I do apologize for not having been able to

7  get you the financial affidavit, but I couldn't make contact

8  with the jail and Mr. Duong.  What I was able to do, though, is

9  make contact with pretrial services, and I had a prolonged

10 conversation with pretrial services officer Ms. Robinson, and I

11 have subsequent to that conversation carefully reviewed the

12 recommendations made and noted in the pretrial services report.

13       In light of those conditions made -- I mean, in light of

14 the recommendation made by Ms. Robinson, I would ask that the

15 Court allow Mr. Duong to continue with his employment.  And I

16 can certainly articulate why the complaint also supports that

17 application, but I -- I do not want to go back and review

18 Ms. Robinson's pretrial services recommendations as

19 memorialized in the report, but they do not even come close to

20 the same conditions that the government is asking for.

21       And I'm only asking for one modification.  All I'm

22 asking for is so that my client can keep his job.  And

23 certainly to the extent that the government has decided facts

24 that counter -- seem to distinguish this case, I can point to

25 several facts that would support his application for continued

1    employment.

2         First, the government did not consider Mr. Duong any

3    kind of danger because they allowed him to remain at liberty

4    starting on January 6th all the way until July 2nd.  So that's

5    many, many months of them having no concern whatsoever about

6    his safety.

7         Now, it is the government that then put him in touch

8    with law enforcement.  It is the government that introduced an

9    undercover FBI agent, and it is the government that introduced

10   another FBI -- another state undercover agent to speak with

11   him.  Now, what is lacking completely from the complaint is any

12   indication of what law enforcement said to Mr. Duong to get

13   these responses from him.

14        But if you look at the complaint -- and especially the

15   early part of the complaint -- you can see that Mr. Duong does

16   not even enter the White House premises or the congressional

17   premises at issue in this case and --

18             THE COURT:  You mean the Capitol?

19             MS. SHROFF:  In the Capitol.

20        So if -- if I could, I'm happy to -- I apologize for

21   that, Your Honor.

22        I would be happy to go through, if you want -- I -- I

23   don't want to belabor any of this, but I highlighted for the

24   Court some of the things that indicate that he had not go

25   through -- he did not cross the threshold, and he tells that to

1    the undercover who pretends to be obviously someone else.

2         He says -- and this is on page 3 -- "Once we found a

3    corner I parked while one of our guys went to the capital [sic]

4    building . . ."  He does not go in.  When asked if he's

5    affiliated with anyone, he says he's not.  He's part of some

6    kind of loose group that doesn't even have a name.  And this is

7    on page 2.  It says, ". . . loosely affiliated, unnamed

8    group . . ."  This is not an organized group.  It seems like a

9    bunch of people who sit around and talk more than anything

10   else.

11        In fact, I'm happy to stop at any point the Court

12   wants --

13             THE COURT:  It's a close case, Ms. Shroff.  Do your

14   thing.

15             MS. SHROFF:  Okay.  So I -- if you -- if you look

16   down and you -- you see on page -- I believe this is page 4,

17   again, it makes clear that he's not with anyone on

18   January 22nd.  This is well after January 6th.  He says he was

19   there by himself documenting things.  He's not part of a group,

20   and he doesn't have any (inaudible) -- any organized activity

21   that -- that should make him somewhat of a greater concern.

22        And then he says on the same page, page 4, he says, "He

23   also said that he did not necessarily approve of the actions

24   taken on January 6th at the U.S. Capitol and that it probably

25   did more to hurt President Trump than it did to help him."

1        So I'm not really sure why the government has decided

2   that in light of those statements this man is of such a risk

3   that they left him out for more than six months on his own and

4   now say that he should not even be left to leave his home on

5   GPS monitoring just to go to work -- I mean work.

6        He does, again, on the same page say that -- that he

7   continued to record the breaches.  He never actually says that

8   he did anything.  He -- I -- I agree; I concede that he has

9   some -- some views about Virginia seceding from the union.

10  But, you know, the entire state of Texas sometimes feels that

11  way, as does the state of Puerto Rico.  So I'm not really sure

12  where you go with that, and it's very dangerous -- it is

13  extremely dangerous for us to start saying that people who

14  think differently from us should be treated more severely just

15  because of the views they hold.

16       I point out mostly (inaudible), Your Honor, that under

17  the case law of humanitarian law, organizing or affiliating

18  yourself with a group, even a group that -- that most people

19  would abhor, is not illegal.  There's nothing illegal about

20  belonging to the group.  There is nothing illegal about the

21  guns he had in his home, and there's nothing illegal, per se,

22  of what the government is pointing to here.

23       When push comes to shove, he doesn't make a Molotov

24  cocktail.  This Court is exactly right.  What does he say?  He

25  says no, I'm not going to do it.  Maybe some other time.  Each

1    time the undercover asks him to do something, he says no.

2    I -- I can -- again, on page 5, the undercover says to

3    him, "Are you both cycling the Capitol tonight?" ... "You sure

4    it wouldn't be a good opportunity to see how they act when they

5    think no one's around?  We can take a car," says the

6    undercover.  What does Mr. Duong reply?  "You are more than

7    welcome to go."  He doesn't go.

8    So I -- I do -- I do think that the Court can very

9    comfortably set the condition that he be on GPS monitoring, be

10   allowed to go to work.  And, look, pretrial services really

11   keeps a tight hold on GPS monitoring.  Should there be the

12   slightest indication of a violation, that he stops off

13   somewhere, but does anything that is outside of the scope of

14   the conditions set by this Court, pretrial can certainly come

15   right back before you and seek a more stringent condition of

16   bail.

17   Finally, Your Honor, I know that the Bail Reform Act

18   says -- the Bail Reform Act makes clear that this Court should

19   set the least restrictive conditions in a case such as this

20   one, and the least restrictive condition here would allow

21   Mr. Duong to continue remaining employed.  I would not want him

22   to lose the job because it will be near impossible for him to

23   find a new one.  He's had steady employment.  They like him at

24   his job, and I just ask the Court to give him the opportunity

25   to show you that he can, in fact, comply with the conditions

```
 1    you set.
 2         Thank you, Your Honor.
 3         THE COURT:  Tell me again about the -- the job.  You
 4    said he's a -- what is he again?
 5         MS. SHROFF:  He's a superintendent at -- at a -- at
 6    a -- I don't want to call it a luxury apartment building.  I
 7    think it's just an apartment building in Alexandria, Virginia.
 8    I -- I have forgotten the name of the building.  So --
 9         THE COURT:  I don't need the name.
10         MS. SHROFF:  Okay.  But pretrial might if they want
11    to verify his employment there, but I -- I worry -- I don't
12    want him to lose the job.  I can get you a pay stub or
13    something like that from his family member.
14         THE COURT:  Uh-huh.
15         MS. SHROFF:  I didn't have anything more to add.
16         Thank you, Your Honor.
17         THE COURT:  Mr. Steiner.
18         MR. STEINER:  Your Honor, just -- just a few things I
19    wanted to add.
20         One, as the Bail Reform Act -- Bail Reform Act requires
21    the Court to look forward-looking here; I think that that's --
22    that's an important thing to take into account.  We -- the
23    conditions of release that are fashioned, they are not only
24    to -- they exist to protect the community going forward and the
25    need to be the least restrictive conditions of release to do
```

1    so, but they are forward-looking.

2         And the defendant's -- the defendant's path here shows

3    why he presents a future danger to the community.  Obviously

4    the government is not asking for detention here, but I think

5    the *Munchel* decision from the D.C. Circuit can be at least a

6    little bit instructive.  By reference, *Munchel* particularly

7    makes note of whether the unique circumstances of January 6th

8    there were -- the reason for the defendant's conduct or

9    violence or obstruction.  That's exactly the opposite, the case

10   here.

11        The defendant here participated in messaging, on

12   (inaudible) cheered them on, but it's really the things he has

13   done since January 6th, the things that the government has

14   uncovered through its ongoing investigation since January 6th

15   that show why he presents such an ongoing and future danger to

16   the community.

17        Obviously Mr. Duong has not been going about his -- his

18   life without the government's involvement.  The government has

19   been investigating him for roughly the past six months.  Again,

20   I want to point out, Mr. Duong was stockpiling the things he

21   needed to make a Molotov cocktail.  He had 50 bottles in his

22   house.  He was stockpiling motor oil from his car.  He was

23   collecting old rags.  He had scoped out a place to test those

24   Molotov cocktails.  It was really just his fear of being caught

25   that was what prevented him from going forward with putting

1    those Molotov cocktails together and testing them out.

2         THE COURT:  I know but wouldn't -- I mean, he had a

3    fear of being caught before he knew that who he's speaking to

4    was an undercover.  Now he's going to be observed at all times

5    by pretrial and by this Court.  Doesn't the fact that he was

6    trying to not violate the law and the fact that -- although

7    you've said a few minutes ago that you were most concerned with

8    his conduct since the 6th that was just all this illegal

9    conduct -- you used the word illegal -- you've not charged him

10   with any -- anything illegal after January 6th; that's not

11   what's in the information right now.  So someone has made a

12   decision not to charge him with that.

13        So the -- the fact that he does seem to try to stay

14   within the law and is concerned about that, doesn't that work

15   to his benefit now, now that he knows that everyone is watching

16   him?

17        MR. STEINER:  Well, Your Honor, I apologize for using

18   that word illegal.  That was, admittedly, a misstatement on --

19   on my behalf, and so I do apologize.  Illegal is not the

20   correct word.  I think being there is something concerning,

21   would be perhaps a more accurate statement.

22        In -- in response to what you've said, I think the other

23   way to read the conduct of the defendant, obviously, is that he

24   was acting and preparing for a battle that he saw coming.  He

25   was doing so discreetly to practice, to prepare himself to

1    fight against the government and against others.  Now that he's

2    been caught, Your Honor, I think there's an extreme risk that

3    the defendant will act it out.  The defendant -- I just want to

4    point out two more statements that have been made, because I

5    think that they show his intent and -- and the way he views the

6    world.

7         The defendant said that he was writing a manifesto,

8    which he compared to that of a serial killer, in the event that

9    he, quote, gets into a gunfight with the feds and I don't make

10   it.  One more statement, Your Honor, the defendant made just

11   very shortly before he was arrested:  Quote, at a certain point

12   the place for peace is too far -- is far too heavy a price to

13   pay, end quote.  I'd give it about another six weeks.  Whatever

14   supplies you can get now, get them now.

15        So these statements show the defendant's continued

16   danger, even despite his arrest and his supervision, and

17   justify the most stringent conditions possible.

18            THE COURT:  Well, you're not seeking to have him

19   held.

20            MR. STEINER:  Correct, Your Honor.  The most

21   stringent conditions of release possible.

22            THE COURT:  I mean, for the record, it's the

23   government who seeks to detain someone who has to motion.

24   Maybe there's not a basis for one here with what he's been

25   charged with.

```
1          MS. SHROFF:  Your Honor, may I just --

2          THE COURT:  But it's been the government's -- you

3   know, it's the government who has the -- the only one who has

4   the ability to begin the process to deem someone as -- as a

5   danger.  I -- I do not have the power to do that.

6          But it's not clear to me that there would be a basis

7   here, a legal basis, to seek to hold him as a danger.

8          MS. SHROFF:  Your Honor, may I just point out one

9   fact?

10         THE COURT:  Go ahead, Ms. Shroff.

11         MS. SHROFF:  Thank you.

12         On page 13 is where, for the Court, Mr. Steiner just

13  recited for the government -- I mean for the Court.  He says,

14  "Yeah, absolutely.  Give it about . . . three weeks."  What

15  happens after about three weeks are given?  Nothing.  He --

16  Mr. Duong does not take any affirmative act.  You see what

17  Mr. Duong does, unfortunately for the government, is protected,

18  all he does is talk.  Because each time this undercover asks

19  him to do something, he retracts.  He just never does it.

20         And it is curious to me that the way this complaint and

21  the facts are drafted, they never once tell you what is it that

22  the undercover said to him as a precursor to this response?

23  But what is it -- and the Court has -- I think the Court has

24  this, but I just reiterate here:  He doesn't do anything.

25  There is no conduct.  And that is the key point here.  There is
```

```
1    zero conduct from Mr. Duong.
2          Mr. Duong talks a lot.  Perhaps --
3              THE COURT:  That may be true.  There is some conduct
4    too, but --
5              MS. SHROFF:  There's some, true.
6              THE COURT:  -- the question is:  Is it enough?
7              MS. SHROFF:  Right.
8              THE COURT:  And they also sometimes say what the
9    undercover asks him, but not all the time.
10             MS. SHROFF:  Right.  And if there were no conduct, I
11   would ask you to release him on his own recognizance.  I
12   completely agree.  I think I've taken a very responsible
13   position here.  All I'm asking you is to (inaudible) job;
14   right?  And I -- and you can -- you can have us come back in
15   30 days for a status to see how he's doing, certainly.
16         And, finally, just one last point.  Munchel was
17   litigated by my colleague Ms. Roland.  I discussed the brief
18   and the opinion with her over and over again.  You know what it
19   says?  Future risk is just not something you guess at.  You can
20   see what this guy will do in months to come because they
21   watched him for months to come, from January to July.  He
22   didn't do anything.  He's -- he's very, very likely -- I'm not
23   allowed to vouch for my client so I won't, but if there is a
24   prognosis to be made, the complaint makes clear he's very
25   likely to obey this Court's order.
```

1          THE COURT:  Okay.  I'm going to take a moment and

2     come back and I'll rule.

3               (Off the record.)

4          THE COURT:  All right.  Let's go ahead and go back on

5     the record.

6     Mr. Duong, are you still on the line?  Are you hearing

7     all of this?

8          THE DEFENDANT:  Yes, sir.

9          THE COURT:  All right.  This is Judge Harvey again.

10    So I am, you know, presented here with a 27-year-old

11    individual who has no prior criminal record, has employment.

12    Ms. Shroff has represented to me that he is employed, has ties

13    to the community, including a family, a child, parents that he

14    lives with in Virginia.

15    The Bail Reform Act requires me to set the least

16    restrictive conditions possible that would reasonably assure

17    the safety of the community and the defendant's return to

18    court.  I don't see any evidence that the defendant is a flight

19    risk.  The government hasn't argued that.  Again, he has no

20    prior contacts with the criminal justice system, no prior

21    failures to appear, or BRA charges, or contempt charges, nor

22    has the government sought to have the defendant detained and is

23    a danger to the community.  Probably because they don't have a

24    legal basis, it would appear, to even make such a request.  In

25    any event, that is not an option that's before the Court.

1     So it's trying to come up with conditions of release

2     that would be sufficiently strict as to reasonably assure the

3     community -- safety of the community and not anything more than

4     that.  I am prepared, given what I've seen, what I've heard

5     here today, and what I've reviewed in the complaint, to place

6     the defendant -- release him with all the conditions outlined

7     by the government and pretrial that I'll review here in a

8     moment, save one, which is the government was arguing for the

9     defendant's home incarceration 24 hours a day.

10     I'm going to take Ms. Schuck up on her alternative,

11     which was to essentially put him in home incarceration but

12     allow him to leave the house for purposes of medical

13     appointments, court, and employment, all of which will need to

14     be worked out with pretrial ahead of time.  So we'll have to

15     know exactly when he is leaving for his job, and he's to go to

16     his job and right back home.

17     Anything outside of court, medical appointments, or his

18     employment, someone else is going to have to do that for you,

19     Mr. Duong:  your wife, your mom, your dad.  You're going to

20     have to be in the house.

21     I've made this decision for a few reasons.  Again, the

22     defendant is -- has not been charged with any of the conduct

23     post-January 6th, which is concerning to the Court for sure,

24     but the government has not charged him with anything regarding

25     that conduct, probably because, as the government admitted,

1    there's nothing -- there was not a legal -- did not step over

2    the line.  I'm sure it was very close, my reading of it.

3         But throughout the government's factual proffer in

4    support of the complaint, what I see is someone who is -- has

5    views which some disagree with, some might consider even

6    extreme, but was also -- has been influenced by a desire to do

7    what he can to stay within the law while possessing those

8    views.

9         The government watched him for a long period of time.

10   It would appear that they were giving him every opportunity to

11   step over the line, and at every point he chose not to.  So

12   like I said during the oral argument, it seemed to me that

13   someone who is that concerned about where the legal lines are

14   should be given an opportunity to show that -- once now that he

15   is being watched by the Court, pretrial, by law enforcement, to

16   show that he can stay -- continue to stay within the lines.

17        I will permit him to continue with his employment until

18   I hear from pretrial that he has violated some aspect of my --

19   the conditions of release, a case that I expect them to put me

20   on notice of that immediately.  And -- and (inaudible),

21   Mr. Duong, at that point you'll be turned over and put into

22   home incarceration full-time or perhaps worse.  So it's

23   important that you comply with all these conditions of release

24   if you want to stay in the least restrictive conditions that

25   the Court can -- I believe can safely impose on you.

1      I would also note for the record that the guns, I've not

2  heard that any of them were unlawfully possessed, and it does

3  sound like all of them have been removed from the house as part

4  of the government's search warrant, seizure in defendant's

5  house upon his arrest.  The condition of my release will be

6  that he -- any other firearms that he has, he cannot possess

7  them.  There can be no firearms or other dangerous devices,

8  including Molotov cocktails or what you might make with them,

9  Mr. Duong, in your house during the pendency of this case.

10      I believe that that is sufficient.  I'm not really

11  certain that if the defendant is going to be out, how much

12  more -- and in his home, what sounds like some of this conduct

13  that is concerning occurred, and yet he will continue to be in

14  his home.  I don't know the risk -- additional risk from

15  allowing him to continue to work while being in his home is

16  marginal, in my view.

17      So if he's going to be out, I think he should be

18  permitted for all these reasons to continue to work and to

19  provide for his family.  I'll reiterate again, Mr. Duong, you

20  violate any of my conditions of release, chances are they'll be

21  even more restrictive going forward or worse.

22      So to reiterate, he will be put in the High Intensity

23  Supervision Program.  He will not have a curfew.  He will only

24  be permitted to leave his home for purposes of employment,

25  court, to come to court, medical appointments, or any other

1    court-approved activity.  So he will need to seek leave of the

2    Court to do anything other than those things.  And you will

3    need to coordinate with our pretrial as to when you will be

4    working during the day.  When you leave that house, they need

5    to know you're going directly to work and when you're coming

6    back home.  You'll be monitored during that entire period of

7    time that you're out of the house.

8         You also are to stay away from D.C. except for purposes

9    of coming to court.  You are to report all contacts with law

10   enforcement.  That includes arrests, stops, questioning.

11   You're to verify your address with pretrial, if you've not done

12   so already.

13        You are not to travel outside of your home district.  I

14   mean, you're going to be on lockdown, so -- and -- and in any

15   sense to -- I don't see any basis for doing so, but you would

16   need pretrial's permission before you could travel outside the

17   home district.  You are to participate in all future court

18   proceedings.

19        You are to comply with all the other requirements of

20   HISP, including drug testing and drug treatment as directed by

21   pretrial services.  You're not to possess a passport.  You are

22   to surrender any passport you may have.  You're not to possess

23   any other travel document during the pendency of this case.

24        And you will be supervised by our pretrial services.

25   You are to report to pretrial on Tuesday, both for an interview

1    and also for, I think, program orientation; isn't that correct,

2    Ms. Schuck?  That would have to be on Tuesday.  We're not going

3    to be able to get that done today; is that right?

4            THE PRETRIAL SERVICES OFFICER:  That is correct,

5    Your Honor.  And he also will not be monitored until Tuesday,

6    because --

7            THE COURT:  Yeah, I understand.

8            THE PRETRIAL SERVICES OFFICER:  -- we cannot get the

9    GPS device on.

10            THE COURT:  No, I understand, but he needs to report.

11            THE PRETRIAL SERVICES OFFICER:  And we would -- we

12    would also request that the Court approve any and all travel

13    outside his home jurisdiction because he is in the HISP

14    program, versus having pretrial services approve any travel.

15            THE COURT:  Okay.  Again, that's fine.  We'll make

16    that a requirement.  I -- I don't know what that might be other

17    than to come to court because he's going to be under

18    essentially home incarceration.

19            THE PRETRIAL SERVICES OFFICER:  We have received such

20    requests --

21            THE COURT:  Okay.

22            THE PRETRIAL SERVICES OFFICER:  -- from individuals.

23            THE COURT:  That's fine.  Give me one moment.  I want

24    to check one thing as well.

25            Oh, and do not possess -- I think I've -- I've said

1    this, but if not, you cannot possess any firearms or other

2    destructive devices, and all such firearms need to be out of

3    your home regardless of who owns them.

4         Anything I've missed, Mr. Steiner?

5         MR. STEINER:  Your Honor, just -- just one additional

6    condition the government requested, and that would be the

7    defendant not have any contact with any victims, witnesses, or

8    other defendants charged in connection with the events at the

9    United States Capitol on January 6th.

10        THE COURT:  Okay.  That will be a condition as well.

11        All right.  Mr. Duong, do you understand all these

12   conditions of release, and are you prepared to comply with

13   them?

14        THE DEFENDANT:  Yes, sir.

15        THE COURT:  Mr. Tran, please swear the defendant to

16   these conditions of release.

17        THE COURTROOM DEPUTY:  Mr. Fi Duong.

18        (Oath administered.)

19        THE DEFENDANT:  Yes.

20        THE COURT:  Thank you.

21        Mr. Duong, I need to give you a few more warnings.  I

22   give these warnings to everyone who is released.  You've heard

23   these conditions of release.  It's important that you comply

24   with each and every one of them.  If you fail to comply with

25   any of your conditions of release, a warrant can be issued for

1    your arrest, your conditions of release could be revoked, and

2    you could be held pending trial in this case.

3            You could also face an additional criminal charge for

4    contempt of court for violating a court-ordered condition of

5    release.  Do you understand that?

6            THE DEFENDANT:  Yes, sir.

7            THE COURT:  Your most important condition of release

8    is that you not commit another state, federal, or local

9    crime -- crime while on release, everything we've talked about

10   up until now, but that is always a condition of release when

11   you're released in a federal case.

12           If you were to commit another crime or a crime while on

13   release in this case, well, again, a warrant could be issued

14   for your arrest, your conditions of release could be revoked,

15   and you could be held pending trial in this case.  You could

16   also face more time, a longer sentence, for having committed a

17   crime while on release in another case.  Do you understand

18   that?

19           THE DEFENDANT:  Yes, sir.

20           THE COURT:  In a moment we're going to set your next

21   court date.  It's important that you show up for that next

22   court date, whether it's in person or remotely.  You show up.

23   And if you fail to appear for that next court date or any other

24   court-ordered date in the future, again, a warrant can be

25   issued for your arrest, your conditions of release could be

1    revoked, and you could be held pending trial.  You could also

2    face an additional criminal charge for failure to appear for

3    court.  Do you understand that?

4            THE DEFENDANT:  Yes, sir.

5            THE COURT:  All right.  Well, let's talk about the

6    next court date.  How are we proceeding, Ms. Shroff?  You're

7    muted.

8            MS. SHROFF:  Your Honor, I did discuss the next date

9    with the United States, and we do not seek a preliminary

10   hearing at this time, and we would ask the Court to set a date

11   that is -- that is appropriate after consultation with the

12   government.

13           THE COURT:  Okay.  Mr. Steiner, what do you want to

14   have for the next date in this case, the defendant having,

15   sounds like, waived the preliminary hearing?  Mr. Steiner?

16           MR. STEINER:  Your Honor, I would -- I would suggest

17   a date of about 60 days out.  That has sort of been the common

18   practice in these cases.  Obviously that will give the

19   government an opportunity to discuss and negotiate and enter a

20   protective order with Ms. Shroff and the defendant, as well as

21   to begin providing discovery to the defendant and engage in any

22   conversations about pretrial early resolutions.

23           THE COURT:  Okay.  Sixty days out would take us to

24   September sometime; correct?  We'll say September -- how about

25   September 3rd at 1:00 p.m.?  Does that work for you,

1    Ms. Shroff?

2              MS. SHROFF:  Yes, Your Honor, that's fine.  Thank

3    you.

4              THE COURT:  Mr. Steiner?

5              MR. STEINER:  That does work for the government,

6    Your Honor.

7         I just wanted to make sure I heard the defendant was

8    waiving the preliminary hearing or just waiving the time

9    provided by Rule 5 --

10             (Indiscernible simultaneous cross-talk.)

11             THE COURT:  Ms. Shroff?

12             MS. SHROFF:  I was just waiving the time provided.

13             THE COURT:  Okay.  Then we'll schedule that for a

14   preliminary hearing, the defendant having waived his right to a

15   more timely preliminary hearing than September 3rd.  Is that

16   correct, Ms. Shroff?

17             MS. SHROFF:  That is, Your Honor.  Thank you.

18             THE COURT:  Okay.  Mr. Steiner, what about the Speedy

19   Trial Act?

20             MR. STEINER:  Your Honor, the government requests

21   that time from today until September 3rd be tolled pursuant to

22   the Speedy Trial Act.  The reasons just stated, including the

23   discovery issues and the protective order, in addition to

24   Judge Howell's Order 21-10, tolls time through August 21st,

25   2021, recognizing the challenges that we have faced and

1  continue to face through the pandemic.

2       Also note that the defendant today is charged in a very

3  large and uniquely complex case involving hundreds of

4  defendants and voluminous amounts of discovery.  Tolling time

5  through the next date will allow the government an opportunity

6  to continue to investigate and review and produce that

7  discovery and evidence.  And, therefore, the ends of justice

8  served by tolling time will outweigh the best interests of both

9  the public and the defendant in a speedy trial.

10            THE COURT:  Ms. Shroff?

11            MS. SHROFF:  Your Honor, since Mr. Duong may want to

12  pursue a pretrial disposition, we agree to the exclusion of

13  time under the speedy trial clock.

14            THE COURT:  All right.  And for all those reasons, I

15  will toll all time between now and the next date,

16  September 3rd, for purposes of any calculation of the Speedy

17  Trial Act.  I do that based on the representations here today

18  and so find that such tolling of time would serve or be in the

19  interest of justice and outweigh the interests of the defendant

20  and public in a speedy trial.

21       Mr. Steiner, anything further we need to do here today?

22            MR. STEINER:  No, Your Honor.

23            THE COURT:  Ms. Shroff, I do -- when we get these

24  conditions of release on the docket tonight or first thing

25  Tuesday morning, you need to get them to your client; all

```
 1    right?

 2              MS. SHROFF:  Yes, Your Honor.

 3              THE COURT:  Okay.  Mr. Duong, we're finished here

 4    today.  We'll see you back here on September 3rd.  Again,

 5    comply with all these conditions of release and there will be

 6    no problems.  Do you understand?

 7              THE DEFENDANT:  Yes, sir.

 8              THE COURT:  All right then.

 9         Parties are excused.

10              (The proceedings concluded at 4:01 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1  <u>CERTIFICATE</u>

2       I do hereby certify that the foregoing is a true,

3  correct, and complete transcript of the audio-recorded

4  proceedings in this matter, audio recorded on July 2, 2021, and

5  transcribed from the audio recording to the best of my ability,

6  and that said transcript has been compared with the audio

7  recording.

8       Dated this 12th day of July, 2021.

9

10                         /s/ Nancy J. Meyer
                         Nancy J. Meyer, Official Court Reporter
11                        Registered Diplomate Reporter
                         Certified Realtime Reporter
12                        333 Constitution Avenue Northwest
                         Washington, DC 20001
13                        202-354-3118
                         nancy_meyer@dcd.uscourts.gov
14

15

16

17

18

19

20

21

22

23

24

25