**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA**<br><br>    **v.**<br><br>**FI DUONG**<br>**also known as "Jim,"**<br>**also known as "Monkey,"**<br>**also known as "Monkey King,"**<br><br>    **Defendant.** | **Case No. 21-cr-541 (PLF)** |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Fi Duong to four months' imprisonment, three years of supervised release, $2,000 in restitution, and the $100 mandatory special assessment for Duong's single count of conviction, Civil Disorder, in violation of 18 U.S.C. § 231(a)(3). The government's recommended sentence is within the applicable Guidelines range.

## I.    INTRODUCTION

The defendant, Fi Duong, a 30-year-old resident of Fairfax County, Virginia, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

On January 6, Duong, a member of a Northern Virginia group called the "Boys" (named after an ultra-violent Amazon Prime television show),[2] approached the United States Capitol Building clad all in black, with goggles over his eyes, and wearing a mask—to blend in with antifa,[3] as he later told an undercover law enforcement employee. As he did so, Duong filmed his progress. As Duong stood outside the Capitol building, he saw firsthand that other rioters who were exiting the building had been sprayed with OC spray. He also saw at least one rubber bullet on the ground. Despite the unmistakable proof that a violent riot was afoot, Duong nonetheless entered the Capitol building through the Senate Wing Door, marched through the Crypt and the Hall of Columns (among other areas), and then exited through the South Door, at the opposite end of the building.

In the months after the January 6 attack, Duong continued to participate in troublingly subversive activities as part of his group – activities that included conducting surveillance of the Capitol building.

The government recommends that the Court sentence Duong to four months' incarceration,

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department (MPD) also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

[2] Duong discussed his group in an interview on the March 25, 2022, podcast *The Political Prisoner Podcast*. *See* https://podcasts.apple.com/us/podcast/the-political-prisoner-podcast-fi-duong/id1595317819?i=1000555226623.

[3] According to FBI Director Christopher Wray, antifa, short for "anti-fascist," does not describe a particular group or organization, but rather is a movement or an ideology. *See* Tucker, Eric "FBI director says antifa is an ideology, not an organization," THE WASHINGTON POST, Sept. 17, 2020, https://www.washingtonpost.com/politics/fbi-director-says-antifa-is-an-ideology-not-an-organization/2020/09/17/6d333458-f915-11ea-85f7-5941188a98cd_story.html.

a sentence that reflects the gravity of Duong's conduct while acknowledging his admission of guilt.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated Statement of Offense filed in this case for a summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.    Duong's Role in the January 6, 2021 Attack on the Capitol

#### *Preparation and Approach to the Capitol*

As Duong reported during a plea agreement-required pre-sentencing interview with law enforcement,[4] on the morning of January 6, Duong took Metrorail to Washington, D.C. He said he wore all black to blend in with antifa, who he expected to be present at a Trump rally he was planning to attend. After checking on his mother's business in northwest Washington, D.C., he went to a nearby location where he had previously purportedly met antifa members but did not find any. He then went to the rally. He wore a Japanese-style mask at the rally, and then later at the Capitol building. He claimed that he did not want to be identified as a supporter of former President Trump given animosity he and others had purportedly experienced in Northern Virginia based on this affiliation. He also claimed there were COVID-19 pandemic mask mandates in place.

---

[4] Law enforcement conducted this interview of Duong on August 15, 2024. The interview was conducted virtually via Microsoft Teams. For the first portion of the interview, Duong was driving while answering questions from the FBI agents. This resulted in numerous technical failures of the technology platform. Eventually, after requests from his counsel and the FBI, Duong stopped driving but remained in the vehicle to complete the interview. Duong also vaped periodically throughout his interview.



Image 1: Picture posted by Duong on Telegram depicting Duong
in the Japanese-style mask he wore on January 6, 2021

After he left the rally, he had lunch with others whom he had met at the rally and then proceeded to the Capitol.

Duong and an associate introduced themselves to a Metropolitan Police Department ("MPD") plainclothes employee in the vicinity of Freedom Plaza in downtown Washington, D.C. At the time, Duong was wearing all black and a mask that was white with an image of a facial expression on it. As he spoke with the MPD plainclothes employee, Duong asked if he/she was a "patriot." The MPD employee responded affirmatively and asked Duong the same. Duong responded by claiming to be an "operative," stated he was on his way to the White House and exchanged phone numbers with the MPD employee. During the conversation, Duong also explained the mask was a Japanese-style mask. Later that day, Duong texted the MPD employee stating he was making his way to the U.S. Capitol building.

On January 6, Duong approached the Senate Wing Door from the west. By 2:38 p.m., Duong stood with a large crowd of protesters just outside the Senate Wing Door. By that point, Duong knew that chemical irritants had been deployed to keep rioters away from the Capitol building. For example, as he stood outside the Capitol building, Duong personally spoke to an individual who was suffering from noticeable, extreme irritation to his face and eyes. At the time, Duong was approximately 50 feet away from the building, and the only logical area the man could

4

have been coming from was one of the two exterior Capitol doors. A few minutes later, as he remained in the same general area, Duong picked up a black circular object approximately two inches in diameter that appeared to be a rubber bullet. He then commented in a video that "they're shooting at us."

Undeterred, Duong advanced toward the Senate Wing Door, preparing to enter the Capitol building. By that point, rioters were climbing in and out of windows to the Capitol within three feet of Duong. Duong entered the Capitol building through the Senate Wing Door at approximately 2:56 p.m.



Image 2: Duong entering the Capitol building as seen in his own video footage

After spending approximately three minutes in the Senate Wing Door lobby area, Duong walked south towards the Memorial Door.



Image 3: Duong approaching Memorial Door (CCTV surveillance video footage)

From there, Duong continued to move south in the Capitol building into the Crypt. He then continued traveling south, past the House Wing Doors,[5] and can be seen on video carrying a red-colored hat and conversing with individuals next to him.

---

[5] The Statement of Offense filed in this matter stated that Duong entered the Rotunda of the Capitol building. Upon further review of surveillance video, it appears that he did not in fact enter the Rotunda and instead stayed on the same floor and walked to the south exit.



Image 4: Duong advancing through House Wing Door (CCTV surveillance video footage)

Duong then walked south through the Hall of Columns South Door wearing the red-colored hat.



Image 5: Duong moving towards the South Door prior to exiting the Capitol building (CCTV surveillance video footage)

Duong then continued towards the South Door and exited the Capitol building through the South Door at approximately 3:03 p.m.

Shortly after exiting the Capitol building, Duong began to run north on the east side of the Capitol building, underneath an exterior stairwell. Within three minutes, Duong had made his way to the north side of the Capitol building, having passed through crowds of protesters on the exterior of the building.

Duong then began walking away from the Capitol building. As he did so, Duong told two other rioters, "They broke in. They had to use tear gas. There is now National Guard in there with rifles… I have it on my camera when a guy took a crowbar, crashed the glass and broke in."

***The Search of Duong's Vehicle, House, and His Associate's House***

As part of its investigation into Duong's activities on January 6, 2021, in July 2021, the FBI obtained and executed warrants to search Duong's vehicle and residence in Fairfax County, Virginia. In the trunk of Duong's car, the agents found a Japanese-style mask with gold-colored painted teeth—the same type of distinctive mask as Duong wore on January 6.



Image 6: Photograph of the trunk of Duong's vehicle during execution of a search warrant, showing Duong's Japanese-style mask



Image 7: A close-up of the Japanese-style mask found in Duong's vehicle's trunk

At Duong's residence in Fairfax County, agents also located yet another Japanese-style mask.

At Duong's residence, the FBI also found several unsecured firearms. In an office area on the basement level, agents saw an AK-47-style rifle loaded with a full magazine and no bullet in the chamber. The rifle was next to the desk, leaning against a shelf. Agents also found a Rock Island Armory 1911 handgun, which was loaded with a bullet in the chamber. In a common area of the basement, agents found a .9 mm Beretta loaded with a magazine. This handgun was kept in an unsecured gun case next to a bed. According to Duong's wife, the couple's two-year-old son liked to play in the room. PSR ¶ 46. Based on this evidence, Duong was charged in Virginia state court. He ultimately pleaded guilty to (1) leaving a gun loaded and (2) endangering a child under the age of 14. He was sentenced to 12 months' incarceration per count, with both terms suspended. *Id.*

As part of its investigation, the FBI also obtained and executed a warrant to search the home of one of Duong's associates. In that associate's laptop, investigators found an image showing Duong, seemingly in the vicinity of the Capitol, wearing the same distinctive clothing and mask that Duong was observed wearing on the Capitol Police's CCTV footage from January 6.



Image 8: Screenshot of image found on computer of Duong's associate appearing to depict Duong as he appeared on January 6 at the Capitol

## THE CHARGES AND PLEA AGREEMENT

On August 25, 2021, a federal grand jury returned an indictment charging Duong with five counts: Obstruction of an Official Proceeding, in violation of 18 U.S.C. §§ 1512(c)(2), 2, Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1), Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(2), Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D), and Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).

On April 21, 2023, Duong was charged by a superseding information with one count of violating 18 U.S.C § 231(a)(3), Civil Disorder. On that same date, Duong pleaded guilty to the information. As part of the plea agreement, the government agreed to dismiss the indictment at sentencing. Also as part of the plea agreement, Duong agreed to pay $2,000 in restitution.

## III.   STATUTORY PENALTIES

Duong now faces sentencing on one count of violating 18 U.S.C § 231(a)(3).

As noted by the plea agreement and the Presentence Report issued by the U.S. Probation Office, Duong faces up to five years of imprisonment, a fine up to $250,000, a term of supervised release of not more than three years, and a mandatory special assessment of $100.

## IV.   THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The PSR calculates the Sentencing Guidelines applicable to Duong's offense consistent with the parties' plea agreement. That Guidelines analysis is as follows:

12

<u>Count One: 18 U.S.C. § 231(a)(3)</u>

| | | |
|---|---|---|
| U.S.S.G. § 2A2.4(a) | Base Offense Level | 10 |
| Adjustment for Acceptance of responsibility (U.S.S.G. §3E1.1) | | -2 |
| **Total Adjusted Offense Level:** | | **8** |

The U.S. Probation Office calculated Duong's criminal history as category I, which is not disputed. (PSR ¶ 47.) Accordingly, Duong's Guidelines imprisonment range is 0 to 6 months.

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 was not in effect and was not considered at the time the parties entered into the plea agreement. The Court should not apply § 4C1.1 here because Duong has a prior criminal conviction, the 2022 Virginia counts of (1) leaving a gun loaded and (2) endangering a child under the age of 14. PSR ¶ 46.

## V.  SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this felony case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a term of four months of incarceration.

### A.  Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Duong's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. As previously discussed, Duong, in disguise to avoid being identified and to blend in with the antifa members he expected to be at the Capitol, joined a large crowd of rioters in the vicinity of the Senate Wing Door. He entered the Capitol despite seeing unmistakable proof that other rioters had just been subjected to chemical irritants, and despite

13

seeing a rubber bullet that had been fired. The nature and circumstances of Duong's offense were serious, and fully support the government's recommended sentence of four months' imprisonment.

**B.      The History and Characteristics of the Defendant**

*Duong's prior military service*

Between 2013 to 2016, Duong served in the United States Marine Corps. He was stationed in North Carolina where he worked as a truck driver. PSR ¶ 67. During his service, Duong received commendations, including for his contribution to the War on Terror. While Duong's service is commendable, it is not a mitigating factor. To the contrary, his participation in the January 6 riot was a betrayal of his oath as a Marine, and his failure to understand his conduct as participation in American domestic extremism is highly concerning.

*Duong's participation in the "Boys"*

As set forth in the Statement of Facts in support of the Complaint (*see* ECF 1), Duong is a member of a Northern Virginia anti-governmental group that, after January 6, was infiltrated by an undercover law enforcement employee. That undercover law enforcement employee attended several gatherings of the group hosted at Duong's home. During these meetings, members discussed attendance at the January 6 riot, conducting additional surveillance on the Capitol building, secession from the United States, and creating destructive devices. The undercover law enforcement employee observed several firearms and boxes of ammunition at Duong's home during these meetings.

On the topic of destructive devices, the undercover law enforcement employee observed Duong and his associates discuss their construction. At a meeting at Duong's house, Duong told the group that another person would be stopping by during one of his work breaks. One of the people present replied, "Oh, me and him get along about as well as brake fluid and pool chlorine. Which would

14

make an opportunistic weapon given the opportunity." Duong responded to this by saying, "I was about to say, I was thinking of...ammonium cel-ummm, it's like bleach, mix it up with a few other things, like basic household chemicals, you get mustard gas." The other person responded, "Don't do that, but I wouldn't mind making CS [commonly used as tear gas] MRE [meals ready-to-eat] bombs. Well, that's um terrorism, felony."

Duong also discussed Molotov cocktails several times with the undercover law enforcement employee, indicating that he knew how to create the destructive device and which supplies he had to prepare them. Confirming the seriousness of Duong's plans, as the undercover law enforcement employee was visiting Duong's residence, he personally observed wine bottles that Duong stated were for use in Molotov cocktails. When asked about his plan for the Molotov cocktails by the undercover law enforcement employee, Duong said, "For me, I'm trying to look at this at a big picture scale...What's the end game here? In some sense you could say the battle is already lost. We just haven't started really shooting each other yet. Or what if we devolve into something like the Spanish civil war where you have pockets of resistance." Duong explained his opinion of current factions in the U.S. and what a civil war could look like. He then went on to say, "Everything that we've built and set up here is for our own mutual defense. Defense of each other's lives and property. Because I have no faith if the police are wrapped up in things...they are not going to bother with your own defense." Duong continued, "Yeah, having fire as a deterrent. Again, even a crazy person, right? They're not likely to want to get themselves lit on fire. And it's a good effective means of deterrence in that sense where it's also ammo efficient. I don't have to waste bullets to keep people away. That's the idea." Days later, Duong told the group about the benefits of using Molotov cocktails to disable vehicles. He said, "So that's what the utility of the Molotov cocktail is. And this is somewhat lost in translation. Cause most people just use it as

anarchist, and, oh yeah and burning shit and doing dumb stuff, right? But it actually, you can disable vehicles by that method." To law enforcement's knowledge, Duong never completed construction of the prohibited destructive devices.

*Duong's criminal record*

As described above, after the FBI searched Duong's home and found several improperly stored firearms, in June 2022, Duong was convicted of allowing access to firearms by children in violation of Virginia law. PSR ¶ 46.



████████████████████████████████████████

████████████████

### C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Duong's criminal conduct on January 6 was the epitome of disrespect for the law.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[8] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of this term of incarceration. As discussed above, Duong's extremist conduct continued beyond January 6, with the Boys' continued surveillance of the Capitol building and preparations for potential future violent conflicts. Due to his dangerousness, Duong has been on home detention since his arrest and should be subjected to a term of incarceration at sentencing. Furthermore, the lack of seriousness that Duong appears to give to this process as evidenced by

_____

██████████████████████████████████████████

[8] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

his cavalier behavior during his August 15, 2024 interview by driving (until told to pull over by his attorney and the FBI agents conducting the interview) and vaping periodically—16 months after his guilty plea—augers in favor of carceral sentence.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

18

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[9] "When an offense is uniquely serious, courts will consider the need to impose stiffer sentences that justify the risk of potential disparities." *United States v. Mattea*, 895 F.3d 762, 768–69 (D.C. Cir. 2018) (cleaned up).

Although the defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no

---

[9] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following two cases provide suitable comparisons to the relevant sentencing considerations in this case. Those cases are *United States v. Evans*, 21-cr-337 (RCL) and *United States v. Christian Cortez,* 21-cr-317 (TSC).

In *Evans,* the defendant, a former West Virginia state legislator, posted about the upcoming January 6 events on his Facebook page in the weeks before January 6, 2021. Evans also livestreamed from the Capitol on his Facebook page and encouraged others to "take" the Capitol. Evans joined a crowd pushing against a police line near the Rotunda Door, where he encouraged others to "Move! Move! Move!" and was pepper sprayed. Evans then entered the Capitol via the Rotunda Door. While inside, he shouted at others not to break or vandalize anything and reminded them that they were in a historical building. Evans then left the Capitol after being inside for approximately ten minutes. Evans later deleted his livestream video shortly after posting it. Like Duong, Evans pleaded guilty to violating 18 U.S.C. § 231(a)(3) and faced a guideline range of zero to six months' incarceration. Evans participated in two voluntary debriefs after he was arrested and charged and expressed remorse for his conduct, which Duong did not do. Judge Lamberth sentenced Evans to three months' incarceration and 36 months of supervised release.

In *Cortez,* the defendant joined the rioters on the West Lawn of the Capitol, where he witnessed the violence committed against officers in that area. Cortez breached the Parliamentarian Door at approximately 2:53 p.m. and joined a pack of rioters facing off with police officers attempting to prevent rioters from further penetrating the building. Cortez then left the Capitol, after being directed by officers. Cortez remained inside of the Capitol for approximately thirteen minutes. Outside of the Capitol, Cortez attempted to reenter the Capitol and also attempted to prevent Capitol police officers from securing the doors. Cortez later verbally confronted the

20

officers while slamming his flagpole into the ground and continued screaming at the officers despite being subjected to OC spray. Cortez did not post and encourage others to attend the protest on January 6, 2021 or promote violence. Nor did Cortez continue to engage in preparations for political violence after January 6. Like Duong, Cortez pleaded guilty to violating 18 U.S.C. § 231(a)(3) and faced a guideline range of zero to six months' incarceration. Judge Chutkan sentenced Cortez to four months' incarceration, three years of supervised release, 60 hours of community service, and $2,000 in restitution.

## VI.    RESTITUTION

The Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011); *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA).[10] Generally, restitution under the VWPA must "be tied to the loss caused by the offense of conviction," *Hughey v. United States*, 495 U.S. 411, 418 (1990); identify a specific victim who is "directly and proximately harmed as a result of" the offense of conviction, 18 U.S.C. § 3663(a)(2); and is applied to costs such as the expenses associated with recovering from bodily injury, 18 U.S.C. § 3663(b). At the same time, the VWPA also authorizes a court to impose restitution "in any criminal case to the extent agreed to by the parties in a plea agreement." *See* 18 U.S.C. § 3663(a)(3). *United States v. Anderson*, 545 F.3d 1072, 1078-79 (D.C. Cir. 2008).

---

[10] The Mandatory Victims Restitution Act, Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA, *Papagno*, 639 F.3d at 1096, including crimes of violence, "an offense against property … including any offense committed by fraud or deceit," "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss." 18 U.S.C. § 3663A(c)(1).

Those principles have straightforward application here. The parties agreed, as permitted under 18 U.S.C. § 3663(a)(3), that Duong must pay $2,000 in restitution, which reflects in part the role Duong played in the riot on January 6.[11] Plea Agreement at ¶ 12. As the plea agreement reflects, the riot at the United States Capitol had caused "approximately $2,881,360.20" in damages, a figure based on loss estimates supplied by the Architect of the Capitol and other governmental agencies as of April 2023. *Id.* (As noted above in footnote 1, the amount of damages has since been updated by the Architect of the Capitol, USCP, and MPD.) Duong's restitution payment must be made to the Clerk of the Court, who will forward the payment to the Architect of the Capitol and other victim entities. *See* PSR ¶ 110.

## VII.   FINE

The defendant's conviction for a violation of 18 U.S.C. § 231(a)(3) subject him to a statutory maximum fine of $250,000. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines require a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a) (2023). Here, the defendant's financial assets set forth in the PSR suggest that the defendant is unable, and is unlikely to become able, to pay a fine. *See* PSR ¶ 86.

## VIII.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a

---

[11] Unlike under the Sentencing Guidelines for which (as noted above) the government does not qualify as a victim, *see* U.S.S.G. § 3A1.2 cmt. n.1, the government or a governmental entity can be a "victim" for purposes of the VWPA. *See United States v. Emor*, 850 F. Supp.2d 176, 204 n.9 (D.D.C. 2012) (citations omitted).

sentence of imprisonment of four months, within Duong's advisory Guidelines range, three years of supervised release, restitution in the amount of $2,000, and the mandatory $100 special assessment.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:      _/s/ Stuart Allen_____
STUART D. ALLEN
D.C. Bar No. 1005102; N.Y. Bar No. 4839932
Assistant United States Attorney
National Security Section
601 D Street, N.W.
Washington, D.C. 20530
stuart.allen@usdoj.gov
(202) 252-7794